UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
CSC HOLDINGS, INC.,

                      Plaintiff,

       -against-

TAYLOR JONES,

                     Defendant.
---------------------------------------------------------------X

**REPORT AND RECOMMENDATION**
05 Civ. 1130 (JS)(WDW)

**WALL, Magistrate Judge:**

This matter was referred to the undersigned by District Judge Seybert for determination of whether a default judgment should enter against defendant Taylor Jones and, if so, the amount of damages to be awarded pursuant to the default. By order dated June 27, 2005, plaintiff CSC Holdings, Inc. ("CSC"), known as "Cablevision," was directed to serve and file papers in support of its damages claim by July 22, 2005. CSC has submitted a memorandum of law in support of its damages claim, the Affidavit of Donald Kempton ("Kempton"), Investigator for CSC Holdings, Inc., sworn to July 15, 2005, and the Affirmation of Melinda M. Dus, Esq. in support of the plaintiff's application for attorneys' fees. No papers in opposition were filed by the defendant. Based on the evidence submitted and for the reasons set forth herein, the court recommends that a default judgment be entered and that judgment be awarded in the amount of $1,500 in statutory damages, and $1,686.50 in attorneys' fees and costs for a total award of **$3,186.50**.

## DISCUSSION

**Service and Default:**

Federal Rule of Civil Procedure 55 establishes a two step process regarding default

judgments. First, the Clerk of the Court enters the party's default. Then a motion is made for entry of the judgment to the district court judge. The Clerk of the Court certified the defendant's default on May 25, 2005, and plaintiff moved for a default judgment. Defendant has not responded to the motion for a default judgment.

Plaintiff has provided an affidavit of service regarding the service of the summons and complaint on defendant at the defendant's place of residence, 49 Osborne Lane, East Hampton, New York. *See* Plaintiff's Memorandum of Law in Support of Damages Inquest Against Defaulting Defendant Taylor Jones, Ex. B. Business records obtained by plaintiff showing that the defendant purchased a converter-decoder device that would allow defendant to unscramble cable signals transmitted by plaintiff listed 49 Osborne Lane as the defendant's address. Kempton Aff. at ¶19, and Ex. C.

According to the affidavit of service, the summons and complaint were affixed to the door of defendant's place of residence and sent to the residence via first class mail pursuant to C.P.L.R. §308(4), New York's "nail and mail" service. Ex. B. Section 308(4) requires that before serving the defendant via the "nail and mail" method, the serving party must use "due diligence" in attempting personal service pursuant to C.P.L.R. §308(1) or in attempting "leave and mail" service pursuant to C.P.L.R. §308(2). Here, the plaintiff attempted personal service on the defendant before resorting to "nail and mail" service. *See infra*.

The Second Circuit has noted that there "are no rigid rules" as to what constitutes due diligence under section 308(4), but that "case law indicates that 'more than two attempts, including some that are during non-business hours, constitutes due diligence.'" *SEC v. Reynolds*, 1996 U.S. App. LEXIS 27423, at *5 (2d Cir. Oct. 18, 1996) (citing *Hardy v. Kasycki & Sons*

2

*Contractors, Inc.*, 842 F. Supp. 713, 717 (S.D.N.Y. 1993); *Barnes v. City of New York*, 51 N.Y.2d 906, 907 (1980)). The due diligence requirement has been found to be "critical to the viability of service under CPLR 308(4)" because "there is less likelihood that a defendant will actually receive the summons when it is served under" that subsection. *Wrobleski v. Morrissette*, 2000 U.S. Dist. LEXIS 822, at *4 (W.D.N.Y. Jan 27, 2000) (finding three attempts at service during a wide range of hours sufficient).

Here, plaintiff unsuccessfully attempted to personally serve the defendant at the defendant's place of residence on March 10, 2005 at 6:15 p.m., March 14, 2005 at 6:55 a.m., and March 15, 2005 at 7:50 p.m. Ex. B. On each occasion, service was attempted at the defendant's residence outside of normal business hours. The defendant has no known business address. After the three failed attempts to find the defendant or a person of suitable age at the defendant's residence, the plaintiff mailed a copy of the summons to the defendant at 49 Osborne Lane and affixed a copy of the summons to the door of the residence. Ex. B. Therefore, the due diligence standard was met and service was completed pursuant to C.P.L.R. §308(4). Based on the affidavit and the facts set forth in the memorandum and affirmation of Melinda M. Dus, the undersigned recommends that a default judgment be entered.

A default constitutes an admission of all well-pleaded factual allegations in the complaint, except those relating to damages. *See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.,* 973 F.2d 155, 158 (2d Cir. 1993). A default also "effectively constitutes an admission that the damages were proximately caused by the defaulting party's conduct: that is, the acts pleaded in a complaint violated the laws upon which a claim is based and caused injuries as alleged." *Cablevision Sys. N.Y. City Corp. v. Loshkin,* 980 F. Supp. 107, 111 (E.D.N.Y. 1997)

(citation omitted).  The movant need only prove that the "compensation sought relate[s] to the damages that naturally flow from the injuries pleaded."  *Greyhound,* 973 F.2d at 159.

Claims for damages must generally be established in an evidentiary proceeding at which the defendant is afforded an opportunity to contest the amount claimed or upon a review of detailed affidavits and documentary evidence.  *See* Fed. R. Civ. P. 55(b)*; Greyhound,* 973 F.2d at 159.  The undersigned's June 27, 2005 order concerned the timing for the submission of papers on whether the default should issue and on damages.  Plaintiff was directed to serve a copy of that order, as well as its papers in support of default judgment and damages on defendant.  Plaintiff served its papers in support of default judgment and damages on July 21, 2005 order by first class mail. Certificate of Service of Susan A. Weindler.[1]  As a threshold issue, the court will address the notice given to defendant with regard to these proceedings.

Due process is satisfied by "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950); *see also Weigner v. City of New York,* 852 F.2d 646, 649 (2d Cir. 1988).  The Second Circuit has noted that "the Supreme Court has consistently held that mailed notice satisfies the requirements of due process." *Weigner,* 852 F.2d at 650 (citations omitted).  Actual receipt of notice that is properly mailed is not required as "[t]he Supreme Court has repeatedly held that notice by first-class mail is sufficient, notwithstanding the Court's obvious awareness that not every first-class letter is received by the addressee." *Id.* at 651.  Plaintiff has provided evidence of its attempts to

---

[1]The Certificate of Service is attached to the Plaintiff's Memorandum of Law in Support of Damages, following Exhibit G, but is not separately numbered.

provide notice to defendant by first class mail. Such attempts will satisfy due process requirements if those mailings were "proper," in that they were reasonably calculated to give defendant notice.

The notices were sent to defendant's residence, 49 Osborne Lane in East Hampton. As noted *supra*, plaintiff was directed to and did submit papers in support of the entry of default judgment and its damages claim in lieu of a hearing. Plaintiff's papers in support of the damages claim have been served on the defendant, who has failed to submit any papers in opposition, despite the June 27 order.

**The Claims Against Jones:**

The complaint in this action seeks damages for the illegal interception of cable television programming signals under 47 U.S.C. §§553(a)(1) and 605(a) of the Cable Communications Policy Act. Those sections prohibit the unauthorized reception of cable television programming services. *See International Cablevision, Inc. v. Sykes,* 75 F.3d 123, 133 (2d Cir. 1993). Section 553, which applies to "unauthorized reception of cable services," provides that "[n]o person shall intercept or receive . . . any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law." Section 605(a) applies to "radio transmission" and "communication by radio," and provides that "[n]o person not being authorized by sender shall intercept any radio communication and divulge or publish the . . . contents . . . of such intercepted communication to any person." The defendant violated both of these sections.

**Cablevision Programming and Billing:**

Cablevision offers cable television services to subscribers who request and pay for them.

Kempton Aff. at ¶2. The programming consists of different tiers of cable television programming services, progressing from "Basic," to "Family," to various levels of "premium" programming, with each step increasing the number of "premium" stations that the subscriber can receive, at a correspondingly higher monthly cost. For example, Cablevision subscribers may elect to subscribe to one or more additional "premium" services such as Cinemax and Home Box Office. *Id*. at ¶3. Cablevision also offers "pay per view" programming, which enables a subscriber to purchase individual movies, sporting events or concerts, many of which are offered continuously on several channels, twenty four hours a day, for a per-event fee. *Id*. at ¶5. The fees for additional premium services range from $1.95 to $14.95 per month, per service. *Id*. at ¶4. Currently, the approximate price of subscribing to packages of services ranges between $13.00 and $80.00 per month, not including pay per view events. *Id*. The $80.00 fee includes the price for Cablevision's Family and Basic services, which must be purchased to receive "premium" programming. *Id*. The fees for pay per view programming range from $3.95 to $54.95 per selection. *Id*. at ¶5.

Legitimate Cablevision subscribers receive their programming through a converter-decoder that allows reception of whatever level of programming the subscriber has opted to purchase. *Id.* at ¶8. To prevent subscribers from receiving programming services for which they have not paid, Cablevision encrypts or "scrambles" the signals for its services, so that when in a scrambled mode, programming services not purchased remain distorted and not viewable on the subscriber's television set. *Id.* at ¶9. Unauthorized interception of Cablevision's programming can be accomplished by using a "pirate" or modified converter-decoder and other descrambling equipment. *Id*. at ¶14.

Cablevision's claims against the defendant arose following an investigation of a business known as Explorer Electronics ("Explorer"), located in Schererville, Indiana. *Id.* at ¶16. CSC suspected that Explorer was engaged in the sale and distribution of "pirate" converter-decoder devices and other descrambling equipment. *Id.* Business records obtained from Explorer confirmed that the defendant had purchased a "Global Universal" descrambling device from Explorer on July 22, 2002. *Id.* at ¶21, and Ex. C. The defendant's residence had subscribed to Cablevision cable television services from November 1994 to September 2003 with an account in the name of Eliza Jones. Kempton Aff. at ¶20.

The type of device purchased by the defendant is compatible with the encryption technology used by Cablevision in Suffolk County, where the defendant lived, thus permitting access to all of Cablevision's cable television programming, including its premium and pay per view programming services, without authorization. *Id.* at ¶22. Indeed, the sole function of such unauthorized converter-decoders or descramblers is to enable its users to receive unauthorized cable television programming without paying for it; the devices serve no lawful purpose. *See Cablevision Sys. N.Y. City Corp. v. Flores,* 2001 U.S. Dist. LEXIS 9351, at *7 (S.D.N.Y. July 6, 2001)(citing *Time Warner Cable of New York City v. Barbosa,* 2001 WL 118608, at *3 (S.D.N.Y. Jan. 2, 2001)); *see also* Kempton Aff. at ¶¶23-24. Here, although the account name and the name of the purchaser of the device are different, the defendant's purchase and possession of such equipment is circumstantial evidence of the defendant's use of such equipment for its sole function – descrambling cable signals without payment or permission. *See Community Television Sys., Inc. v. Caruso*, 284 F.3d 430, 437 (2d Cir. 2002) (affirming district court's ruling that court could presume from defendants' purchase of illegal descrambling devices that the defendants used such devices); *DirecTV, Inc. v. Griepsma* 2005 WL 608250 at

7

*7 (W.D.N.Y. Mar. 11, 2005) (holding that plaintiff's evidence that the defendant had purchased a descrambling device created a rebuttable presumption that the defendant used the device); *Cablevision of Conn., L.P. v. Noferi*, 371 F. Supp. 2d 110, 115 (D. Conn. 2005) (same). Thus, the facts alleged in the complaint support a finding that Jones violated both sections 553 and 605 of the Communications Act, and that the plaintiff is entitled to damages.

**Damages:**

Where a defendant has violated both sections 553 and 605, a plaintiff is entitled to the greater damages available under section 605, as well as to a mandatory award of attorneys' fees pursuant to § 605(e)(3)(B)(iii). *See Sykes,* 75 F.3d at 129. The plaintiff has opted to receive statutory, rather than actual, damages pursuant to 47 U.S.C. § 605(e)(3)(C), which allows an award of statutory damages "for each violation of subsection (a) of this section involved in the action in a sum of not less than $1,000 or more than $10,000, as the court considers just." The plaintiff seeks an award of $1,500 in statutory damages, and $1,686.50 as reasonable attorneys' fees.

Among the relevant criteria in setting a figure for statutory damages are "the amount of money saved by the violator and the revenues lost by the plaintiff." *Time Warner Cable of N.Y. City v. Dockins,* 1998 U.S. Dist. LEXIS 22689, at *18 (S.D.N.Y. Sept. 4, 1998). Because the defendant has defaulted, it is impossible to determine the actual amounts saved by the defendant or lost by the plaintiff, and an estimate must be made. In this regard, the length of time that the descrambler was in use and the customer's Cablevision subscription history are significant. Although the defendant was not the Cablevision subscriber at 49 Osborne Lane, the court may still award the plaintiff damages for the defendant's unauthorized use of the cable television services. *See, e.g., Cablevision Sys. N.Y. City Corp. v. Flores*, 2001 U.S. Dist. LEXIS 9351

8

(S.D.N.Y. July 6, 2001); *Cablevision Sys. N.Y. City Corp. v. Cateras*, 1998 U.S. Dist. LEXIS 22675 (S.D.N.Y. May 1, 1998).

Some courts have awarded damages from the date of the defendant's use of the decoder until the default. *See, e.g., Time Warner Cable of N.Y. City v. Peluso,* CV-00-1539, Report and Recommendation (E.D.N.Y. Feb. 13, 2001) (RML), *adopted,* (E.D.N.Y. Mar 5, 2001) (NG). An alternative approach is an award of damages from the date of purchase to the date of filing of the complaint. CSC alleges that the defendant's residence subscribed to Cablevision cable television services from November 30, 1994 until September 11, 2003. CSC is seeking damages only for the period of time between the purchase of the device – July 22, 2002 – and the date of the termination of the residence's Cablevision subscription – September 11, 2003. Thus, damages will be based on a period of 14 months of use. *See* Plaintiff's Memo at 7.

Cablevision was paid approximately $40 per month for the cable television services subscribed to at the defendant's residence of 49 Osborne Lane during the relevant period of time. *Id.* The cost for premium service during the same period was approximately $80.00 per month. Kempton Aff. at ¶4. Thus, the approximate damages to CSC for the relevant period is the difference between what was paid for the cable television services and what the level of services that the illegal device gave access to would have cost over the 14 months between the time the illegal device was purchased by the defendant and the time Cablevision cable television services were terminated at 49 Osborne Lane. The difference between the monthly payment for cable television services, $40, and the cost of the premium cable services the illegal device gave access to, $80, is $40 per month. Thus, the total estimated damages for the unauthorized access to premium programming for the entire 14-month period totals $560.

CSC is also entitled to damages based on defendant's unauthorized access to pay per view

9

programming. Here, the plaintiff seeks an award of $50 per month for access to pay per view service. This court finds the amount sought to be reasonable and recommends that an amount of $50 per month be considered in estimating the damages associated with the defendant's access to pay per view events for 14 months, $700, for a total of $1,260 in estimated damages.

Based on these estimates, and estimating upward for deterrence, the court recommends an award of $1,500. This award is reasonable, based on the value of the services that the defendant had access to without paying for them. Had the defendant appeared and contested the damages, it is possible that the damages award would have been less. The defendant, however, chose to default and the court must draw every inference against the defendant. In this regard, it has been noted that "[o]n a national scale, cable piracy results in revenue losses of approximately $5.1 billion, exclusive of pay-per-view service theft." *Flores,* 2001 U.S. Dist. LEXIS 9351, at *11. Given the magnitude of this problem, deterrence of future violations is of great importance, and damage awards should reflect that goal.

**Attorneys' Fees:**

The court also recommends that the plaintiff be awarded $1,686.50 in attorneys' fees and costs, pursuant to §605(e)(3)(B)(iii). The plaintiff has supported its request with the requisite documentation showing, for each attorney, the "date, the hours expended, and the nature of the work done," and the court finds it to be reasonable. *See New York State Ass'n for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1154 (2d Cir. 1983).

The court recommends that judgment be awarded in the amount of $1,500 in statutory damages, and $1,686.50 in attorneys' fees and costs, for a total award of **$3,186.50**. The plaintiff is directed to serve a copy of this Report and Recommendation on the defendant by certified mail, and to file proof of such service with the court.

## OBJECTIONS

A copy of this Report and Recommendation is being served on the plaintiff on the date below by electronic docketing. The plaintiff shall serve a hard copy of it on the defendants and shall electronically file proof of that service with the court. Any objections to this Report and Recommendation must be filed with the Clerk of the Court with a courtesy copy to the undersigned within ten days after service of the Report. Failure to file objections within this period waives the right to appeal the District Court's Order. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; *Beverly v. Walker,* 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank,* 84 F.3d 52, 60 (2d Cir. 1996).

Dated:  Central Islip, New York
         October 5, 2005

                                            /s/ William D. Wall
                                            WILLIAM D. WALL
                                            United States Magistrate Judge